DENNIS J. ROBERTS *vs.* BOARD OF ELECTIONS *et al.*

DECISION JANUARY 1, 1957.

OPINION FEBRUARY 13 as of JANUARY 1, 1957.

PRESENT: Flynn, C. J., Condon, Andrews and Paolino, JJ.

## OPINION.

CONDON, J. This is a petition for certiorari to review the action of the respondent state board of elections in declaring Christopher Del Sesto, the other respondent, elected governor of the state at the general election held on November 6, 1956. We issued the writ and in compliance therewith the board made due return of its records pertaining to the election of governor. The respondent Christopher Del Sesto took over the defense to the petition, the board by its counsel expressly consenting thereto in open court. We shall hereinafter refer to him as the respondent. As such respondent he neither moved to dismiss the petition nor filed any answer or special plea to it, but proceeded to a hearing on its merits. Therefore the validity of the petition and the facts alleged therein are undisputed.

The facts are as follows. On election day petitioner received on the voting machines in the polling places throughout the state 190,259 votes and the respondent received 190,052 votes. In addition each received a certain number of votes cast by members of the armed forces and the merchant marine of the United States in active service and absent from the state, of which 2,056 were counted for petitioner and 1,552 for respondent. The total for each candidate then stood as follows: 192,315 for petitioner and 191,604 for respondent. On the basis of these admittedly valid votes petitioner had a clear majority of 711 votes, and unless there were other votes legally cast by qualified electors the board should have declared petitioner elected.

However, over the protest of petitioner the board counted certain ballots cast by civilian electors absent from the state and by other civilian electors "who, by reason of old age, physical disability, illness or for other physical infirmi-

ties" were unable to vote in person although within the state. The electors of the first class are sometimes referred to as civilian absentee voters and those of the second class as shut-ins. They cast their ballots and forwarded them by mail under the provisions of general laws 1938, chapter 319, as amended.

That chapter, as amended, purported to authorize such electors to vote *in absentia* on or *before* election day. It had been originally enacted pursuant to article XXI of amendments to the state constitution and authorized voting only on election day. Subsequently article XXI of amendments was expressly annulled by article XXIII of amendments which also did not authorize voting *before* election day. Thereafter the general assembly undertook to amend chapter 319 apparently intending thereby to give effect to that constitutional amendment. Some of the ballots that were voted under such amended chapter had been cast on election day but a much larger number had been cast before that day. After counting all of such ballots the board found that the total vote for petitioner was 194,547 and for respondent 194,974, and it thereupon declared the latter elected.

The petitioner protested before the board that it should not count any ballots cast by either the civilian absentees or the shut-ins, contending that article XXIII of amendments was not self-executing and that there was no valid legislation implementing it; and he argued further that such attempted legislation under which the ballots had been issued to said civilian absentees and shut-ins was unconstitutional. The board refused to entertain petitioner's objection on the ground that it was without jurisdiction to pass upon the constitutionality of the election law and that it was its duty to count all ballots cast under such law unless and until this court declared it unconstitutional.

As a consequence of such ruling, petitioner promptly filed the instant petition and sought a stay of the issuance by the board of a certificate of election to the respondent until

the questions thus raised affecting the legality of the civilian absentee and shut-in ballots could be determined according to law. We issued such stay and peremptorily assigned the case for hearing at the earliest possible date consistent with the right of counsel to make reasonable preparation.

The case has naturally aroused intense public interest. This is understandable in view of the ultimate issue involved. Notwithstanding the emotional overtones of the discussion of it elsewhere, it is worthy of note that the case was argued here strictly in keeping with the customary decorum of this court. With commendable ability and zeal yet without rancor, counsel for each party urged every legitimate legal point in support of their client's interests. Their appeals were always addressed to the law and the precedents as they understood them, and never to the emotions. Such restraint on their part appeared to have communicated itself to others who crowded the courtroom far beyond its capacity. They too demeaned themselves in a manner befitting the time, the place, and the constitutional issue that was presented.

We mention these facts to show that we are not unmindful of the human emotions which tend to prevent a calm approach to the cold, legal aspects of this case. Others, without having the supreme judicial responsibility under the constitution, may indulge those emotions and play upon them, but we in this court may not do so. On the contrary we are in duty bound to put emotional arguments completely aside and to decide the case, as we do every other case, solely by the rule of law. Only in that way can the people of this state hope to retain and enjoy that priceless possession of free men, a government that guarantees liberty and justice under law. What then is the rule of law which governs the right of these civilian absentees and shut-ins to vote?

In this state the time and the place of voting for governor and other state officers was fixed by the constitution

from the beginning. Article XVI of amendments, which now governs, expressly provides that they "shall be elected at town, ward and district meetings on the Tuesday next after the first Monday in November, biennially, commencing A. D. 1912 * * *." For eighty-seven years after the adoption of the constitution down to 1930 there was only one exception to the rule that an elector must appear in person at his polling place in order to exercise his right to vote. That exception was article IV of amendments which was adopted in August 1864 and provided that an elector absent from the state in time of war in the actual military service may vote *on the day of election* by delivering a written or printed ballot with the names of the persons voted for thereon to the officer commanding his regiment or company.

In 1918 the judges of this court as then constituted, namely, C. Frank Parkhurst, William H. Sweetland, Walter B. Vincent, Darius Baker, and Charles F. Stearns, unanimously advised Governor Beeckman that no elector except those entitled to claim the privilege of article IV of amendments could exercise his right to vote otherwise than in person in his town, ward or district meeting *on election day. In re Right of Electors in the Military Service of the United States,* 41 R. I. 118.

On November 4, 1930 the people adopted article XXI of amendments which provided that any elector absent from the state and otherwise qualified to vote at the general election should have the right to vote for all officers and propositions on the state ballot. Unlike article IV of amendments, however, it was not self-executing but required legislation to make it effective. This amendment expressly authorized the general assembly to enact such legislation, annulled said article IV, and further authorized the enactment of special regulations to govern the manner of voting by electors absent from the state in the actual military service of the United States.

Pursuant to that amendment the general assembly enacted public laws 1932, chapter 1863, which later became chapter 319 in the revision of general laws of 1938. This is sometimes referred to as the absentee voter law. That statute sets out in minute detail what the elector must do in order to exercise the exceptional privilege granted to him by the amendment. And in §6, consistently with the view so clearly stated unanimously in *In re Right of Electors in the Military Service of the United States, supra,* it was expressly provided: "The absentee voter, upon receipt of the absentee voter's ballot as provided in this chapter, shall vote the same *on said election day* at some place without the state of Rhode Island * * *." (italics ours) Thereafter the above language which we have italicized appeared in two subsequent amendments of the chapter down to May 11, 1953 when chap. 3204 of the public laws of 1953 was approved. In that chapter *for the first time* it was provided that such ballot could be voted "on or before said election day * * *."

In the meantime, eleven years prior to that amendment of the statute, the Honorable the House of Representatives had asked this court: "May the legislature authorize those absent from the state in the actual military service of the United States, in time of war, to cast absentee ballots, before the Tuesday next after the first Monday in November, the time for holding biennial general elections?" The judges of this court as then constituted, namely, Edmund W. Flynn, William W. Moss, Antonio A. Capotosto, Hugh B. Baker, and Francis B. Condon, unanimously answered that question in the negative and stated: "Whatever other power may be vested in the general assembly by the last sentence in article XXI, section 1, that sentence gives no power to the general assembly to change the day of the general election held biennially, when the vote of a qualified elector, whether an absent elector or not, shall be cast." *Opinion to the House of Representatives,* 67 R. I. 465, 469.

The general assembly apparently abided by that opinion and did not enact legislation to the contrary. Subsequently a constitutional convention was held on March 28, 1944 at which an amendment was proposed to the constitution which expressly authorized the general assembly to prescribe the *time* of voting by members of the armed forces. That amendment, which is article XXII of amendments, was adopted April 11, 1944 and besides specifically authorizing absentee voting by "members of the armed forces and the merchant marine of the United States in active service," it provided: "and the general assembly is also authorized and empowered to enact legislation prescribing *the time,* place, manner and extent of voting by such members * * *." (italics ours) The people thus extended the power of the general assembly so that thereafter it could constitutionally authorize such members of the armed forces and the merchant marine to vote on or before election day, but significantly nothing was provided expressly or by necessary implication in that amendment to authorize the general assembly to fix the time for voting by civilian absentee and shut-in voters.

However, some years later the general assembly proposed to the people article XXIII of amendments, which the latter adopted on November 2, 1948. This amendment authorized not only electors absent from the state to vote as provided by article XXI, but it also extended the privilege to electors within the state who were unable to vote in person at their polling places because "of old age, physical disability, illness or for other physical infirmities." It also authorized such civilian absentees and shut-ins to vote for officers and on all questions on the city, town or water district ballots as well as those on the state ballot, which article XXI did not. It further provided that the general assembly should have the power to carry the amendment into effect, but again significantly it did not authorize that body to prescribe *the time of voting* by civilian absentees

and shut-ins, as article XXII had done for those in the armed forces.

Apparently the general assembly recognized a distinction in the problems affecting the exercise of the special privilege by the members of the armed forces on the one hand and by the civilian absentees and shut-ins on the other, and accordingly it did not ask the people for the power which had been given to it by article XXII. We are, therefore, unanimously of the opinion that the constitutional pattern is clear, and that article XXIII does not authorize the general assembly to provide for voting by civilian absentees and shut-ins thereunder at any time other than on the day of election as expressly prescribed by the constitution in article XVI of amendments.

Under article I, sec. 4, of the federal constitution the legislatures of the several states are expressly authorized to fix the time of holding elections for senators and representatives in congress, so that this opinion has no application to the election of such officers.

Article XXIII of amendments to the state constitution expressly annulled article XXI of amendments and did not contain any saving clause preserving the legislation which had been enacted thereunder and under which civilian absentee voters had been exercising their privilege of voting in absentia since 1932. It is undisputed that article XXIII was not self-executing and therefore required legislation to implement it. See *Opinion to the Governor* (The Registration of Electors), 22 R. I. 651.

The petitioner argues that the general assembly failed to enact such legislation. The respondent contends that since the general assembly, after the adoption of that article, did pass certain amendments to G. L. 1938, chap. 319, purporting to carry out the intent thereof, namely, P. L. 1949, chap. 2316, P. L. 1950, chap. 2637, P. L. 1953, chaps. 3204 and 3205, P. L. 1954, chap. 3314, and P. L. 1955, chap. 3456, it had effectively implemented the article of amend-

ment. The petitioner claims such legislative amendments were abortive since they purported to amend a law which did not exist. He contends that such law fell with the express annulment of article XXI of amendments on which the law was based. In support of that claim he relies upon the well-recognized principle that, in the absence of a saving clause, legislation which is dependent upon or subsidiary to a constitutional provision which has been repealed falls with such provision, and he cites *State* v. *Tonks,* 15 R. I. 385, *Williams* v. *Standard Oil Co. of Louisiana,* 278 U. S. 235, *Dorchy* v. *State of Kansas,* 264 U. S. 286, *Railroad Retirement Board* v. *Alton R. R.,* 295 U. S. 330, *Carter* v. *Carter Coal Co.,* 298 U. S. 238, and *United States* v. *Chambers,* 291 U. S. 217.

We have examined those cases and we are in accord with the principle applied to the facts therein. However, in the case at bar we think the factual situation which confronts us differs in kind and degree to such an extent that a majority of the court feels that a liberal construction should be applied to the amendatory acts passed by the general assembly subsequent to the adoption of article XXIII of amendments and that they should be treated as manifesting an intent on the part of the general assembly to implement such article of amendment by re-enacting the prior statutory law by reference.

It is conceded that such a construction is extremely liberal and something may well be said by the petitioner in criticism of it. However, inasmuch as a rule of statutory construction only is involved in this phase of the case, we feel warranted in indulging such liberality in order that as many of these civilian absentee and shut-in votes as it is constitutionally possible to save may not be lost. Therefore, we hold that such part of G. L. 1938, chap. 319, as amended, which authorizes voting *on* election day is valid and that part which purports to authorize voting *before* election day is invalid. See *State* v. *Clark,* 15 R. I. 383. On

that view we are of the opinion that there is effective legislation by reference substantially implementing article XXIII of amendments so far as it concerns voting by civilian absentees and shut-ins *on* election day. The board is therefore lawfully authorized to receive and count the ballots cast by such electors on election day.

In view of the urgency of a prompt decision we directed the board to ascertain the number of those ballots. They have done so and have reported to us that 648 such ballots were cast *on* election day. By crediting the respondent with all of such ballots, notwithstanding some of them were probably cast for petitioner, the result favorable to petitioner as disclosed by the voting machine totals and the total of the ballots cast by members of the armed forces would not be altered. Consequently we find it unnecessary to examine 270 civilian absentee and shut-in ballots to which petitioner had objected for certain reasons pertaining to each ballot which had been segregated pursuant to such objection. In view of the official tabulation of the board as above disclosed, it is our further opinion that the board should issue a certificate of election to petitioner, since our order in this case is that the record of the board in counting certain civilian absentee and shut-in ballots which were cast *before* election day and the declaration of election of the respondent based thereon is illegal and void and must be quashed.

Before concluding we must advert to one other point because there is a diversity of opinion thereon among the members of the court. Although the respondent did not file any motion to dismiss the petition on the ground that petitioner was not entitled to prefer it, he contended in his brief and in oral argument that petitioner's failure, before the board of elections, to have all civilian absentee and shut-in ballots marked and segregated precludes him from having the board's action reviewed and the constitutionality of chapter 319, as amended, determined by this court in these certiorari proceedings. However, before the board

he conceded that petitioner had the right to raise that question saying: "It is properly within the rights of Governor Roberts, if he wants to challenge the constitutionality of this section of the statute, nobody objects to his right to do that." Transcript of the Board of Elections, page 715.

Nevertheless, he now seeks to make an opposite contention and relies chiefly on his interpretation of *Brereton* v. *Board of Canvassers*, 55 R. I. 23. There are several answers to this contention insofar as it is urged against our considering the above issue. In the first place the determination of the validity of the statute does not require examination of any ballots. Secondly, petitioner objected to the counting of *all* civilian absentee and shut-in ballots before the count of all ballots was finally concluded by the board and the result announced. He thus properly brought in question upon the record the constitutionality of the statute upon which the jurisdiction of the board to receive and count all ballots cast pursuant thereto depends. See *State* v. *Garnetto*, 75 R. I. 86.

The respondent has apparently misconceived the *Brereton* case. In that case the petitioner did not raise any objections to the rulings of the board of canvassers at the counting of the ballots although in his petition for certiorari he alleged that he had. As a result of such allegations the writ issued but at the hearing before us he was unable to sustain such allegations and we quashed the writ. Neither at the hearing before the board nor here did he question the validity of the election law and he did not raise any question of the right of any elector to vote. In fact no question of the constitutional right of absentees or shut-ins to vote was involved in that case. His contentions were based solely on the alleged illegal manner in which certain ballots were marked by the voter. We pointed out in our opinion that such questions could not be raised for the first time in this court but that they should have been raised before the board, and that each protested ballot should have been

marked for identification and segregated there for purposes of review here. The petitioner at no time either before the board or in this court raised any question of the board of canvassers' jurisdiction to receive and count any ballots nor did he bring upon the record a question of the constitutionality of the election law.

In the case at bar the constitutional issue, which the respondent before the board conceded that petitioner had the right to raise, concerned the legal authority of two classes of voters to vote at all, and not whether certain specific ballots were properly marked by the voter in accordance with law. The sum and substance of petitioner's claim is that no civilian absentee or shut-in ballots should be counted, because there is no valid statute authorizing such ballots to be voted under article XXIII of amendments, and therefore the board was without jurisdiction to receive and count them.

That is a pure question of law which may be determined wholly aside from an examination of the ballots. In fact an inspection of the ballots *as such* could not possibly aid in determining this fundamental question of law. Further since it is a question of jurisdiction over the subject matter it could be raised at any time. Moreover, involved in petitioner's claim is the further contention that in any event the statute is unconstitutional. Such question having been brought upon the record before the board, there can be no doubt that certiorari lies in this court to have that issue finally determined. *Thayer Amusement Corp.* v. *Moulton*, 63 R. I. 182. The majority of the court, therefore, have no hesitancy in holding that petitioner is properly here.

The respondent has raised a further objection, namely, that petitioner is estopped to question the validity of the statute under which the challenged ballots were cast because as governor he approved such statute. There is no merit in that contention. It would be a mischievous precedent if we were to hold that a governor or a member of the

general assembly must submit to an unconstitutional law merely because in the performance of his official duty he had participated in the enactment of such law. We are aware of no case where any court has gone to that extent in applying the doctrine of estoppel to such officers and we doubt if any can be found. Without further prolonging this opinion we may say that we have considered the respondent's other objections based on estoppel, laches and waiver and we find them all to be lacking in merit.

Our conclusions may be summed up in a few sentences. The people of this state have the sole power to say when and where the votes for officers on the state ballot may be cast. They have authorized the general assembly to allow members of the armed forces to cast them when and where it prescribes. They have not authorized the general assembly to allow civilian absentees and shut-ins to vote at any time other than on election day. If we were to give effect to that part of the statute which permitted them to vote before election day and allow such ballots to be counted, notwithstanding that we hold such portion of the statute unconstitutional, we would be usurping the power which the people have reserved to themselves.

This court may not evade its plain duty no matter how disagreeable the consequences. The power to keep the legislative department within its constitutional limits has been lodged here by the people and they have a right to expect us to exercise it in a proper case. Speaking of that power and the duty of the court to declare a statute which conflicts with the constitution void, the supreme judicial court of Massachusetts declared in *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, at page 244: "It is a necessary function, if constitutional provisions are to be the supreme law, and not mere declarations of policy to be disregarded by the Legislature at will."

And further on the same page that court stated: "The people by the Constitution created the legislative branch

of government as well as the executive and judicial branches, and conferred and at the same time limited the powers of each of them. Each must act pursuant to the Constitution and within the authority conferred by it. Once the idea of enactments at different levels of authority is grasped, it becomes clear that a provision contained in a statute cannot have any force as law if it conflicts with any provision contained in the higher law of the Constitution." Later in applying this principle they said at page 245: "When one party relies on some provision of a statute, and the other relies on some provision of the higher law of the Constitution, with which, it is alleged, the statute conflicts, the court, in order to determine what the law really is, must first decide whether there is conflict. If there is, its duty is to apply the higher law of the Constitution, and disregard the statute."

We recognize that this court, in keeping with those principles, is in a real sense the guardian of the constitution. To discharge that task it has been vested with the power to prevent the other departments of the government from transgressing the limits set for them by the constitution. We would be recreant to our trust if we did not scrupulously observe it ourselves. Being convinced beyond a reasonable doubt, as we are, that there is no constitutionally valid statute permitting civilian absentee or shut-in voters to vote *before* election day and no jurisdiction in the board to count their votes, it is our plain and imperative duty to declare all such votes illegal and void. *Carr* v. *Brown,* 20 R. I. 215. As was so well said by the judges of the supreme court of Connecticut with reference to the unconstitutionality of a similar election statute in that state, "* * * the people saw fit, in their determined intention that all elections should be regulated by constitutional provisions, unalterable by the General Assembly, to prescribe in the clearest manner when, where, and how the elective franchise should be exercised, and these provisions must control the General As-

sembly *in all exigencies,* until changed by the supreme will of the people, expressed in a new or amended constitution." *Opinion of the Judges of the Supreme Court,* 30 Conn. 591, 600 (1862).

The petition for certiorari is granted. The record of the board of elections pertaining to the counting of civilian absentee and shut-in ballots cast before election day and to the declaration of respondent's election as governor is quashed. Pursuant to our decision in this matter heretofore filed on January 1, 1957 the records certified to this court are ordered returned to said board.

ANDREWS, J., dissenting. The essential facts and principles of law material to my dissent in this case are substantially the same as in the case of *McGann* v. *Board of Elections,* 85 R. I. p. 223, 129 A.2d 341, in which I have filed a dissenting opinion and it seems to me unnecessary to file another extended opinion.

In my judgment the reasons which I have stated in the above-mentioned case apply here and the instant decision should read: "The petition is denied and dismissed, the writ is quashed, the restraining order heretofore entered is dissolved, and the records certified to us are ordered returned to the board of elections with our decision endorsed thereon."

*John G. Coffey, Michael DeCiantis, John T. Walsh,* for petitioner.

*Stephen F. Achille,* for respondent Board of Eléctions.

*Alfred H. Joslin, Edward L. Godfrey, Edward V. Healey, Jr., Hinckley, Allen, Salisbury & Parsons, Tillinghast, Collins & Tanner, Albert A. Nutini, Harold H. Winsten,* for respondent Christopher Del Sesto.